UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>       vs.<br><br>ELAINE MARTIN,<br><br>    Defendant. | Case No. 1:13-CR-0065-BLW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## INTRODUCTION

The Court held a forfeiture hearing on December 11, 2013, and ordered further briefing that has now been received. After reviewing the evidence and testimony submitted at the hearing, and the additional briefing, the Court finds that the defendant Elaine Martin shall forfeit $3,084,038.05. The Court's analysis is set forth below.

## LITIGATION HISTORY

On September 19, 2013, Martin was found guilty of conspiracy to commit wire fraud and mail fraud, among other claims. The Government then moved for a preliminary order of forfeiture based on the jury's verdict. Because Martin opposed forfeiture and disputed the amount of any money judgment, the Court held an evidentiary hearing, taking testimony from seven fact witnesses: Julia Wright, Julie Ann Caldwell, Elizabeth Healas and Agent Joshua Culbertson were called by the government; Tory Martin, Dora Prudhomme and John (Jack)

Snyder were called by the defendant. This testimony and the admitted exhibits form the basis for the Findings and Conclusions set forth below.

## FINDINGS OF FACT

1. Defendant Martin had an ownership interest in MarCon Inc., a company that installs steel guardrail and places precast concrete barriers on highways.

2. From approximately 1997 through 2008, Martin opened and maintained a business checking account at the Bank of Cascades for MarCon.

3. During this same period, Martin and her co-owners regularly received checks from this account but failed to disclose those payments – or even the existence of the account – to their external accountant, who prepared the federal income tax returns for MarCon and its shareholders.

4. As a result, the federal income tax returns prepared and filed on behalf of MarCon and its shareholders for tax years 1997 through 2007 were false and fraudulent.

5. Martin used these fraudulent tax returns, along with other false statements concerning her finances, to qualify for special programs – described in more detail below – that resulted in MarCon being selected to provide barriers for various construction projects.

6. Martin was convicted of conspiracy to defraud the United States, and to commit wire fraud and mail fraud, as set out in Counts 5 and 12 of the Superseding Indictment.

7. These convictions stem from Martin's participation in two different federal government programs: (1) the Small Business Administration (SBA) 8(a) Program, and (2) the U.S. Department of Transportation's (U.S. DOT's) Disadvantaged Business Enterprise Program (DBE Program).

8.  The programs are similar in that they are designed to assist individuals who are deemed "socially" and "economically" disadvantaged.

9.  To participate in either program, an applicant must show she meets the eligibility requirements by submitting an application. Once admitted into either program, a participant must show she remains eligible through annual renewal applications.

10. A crucial component of the initial and renewal applications are tax returns, as well as a personal financial statement.

11. Both the SBA 8(a) Program and the DBE Program are designed to assist their participants in competing for, and obtaining, work on federally-funded contracts, either as the prime contractor or a subcontractor. The SBA 8(a) Program does so by identifying and setting aside certain contracts for 8(a) participants. These sole-source contracts are not awarded through a competitive bidding process. Rather, contracting officers solicit and engage in one-on-one negotiations with 8(a) certified firms.

12. The DBE Program does not use such set-asides; rather, it relies on an overall state "goal" and contract-specific "goals," where the "goal" refers to the percentage of federal funds that will, ideally, be ultimately paid out to certified DBE firms.

13. Idaho has always had an overall state goal; it used contract-specific goals until approximately 2006.

14. Utah has, and continues to have, an overall state goal and contract-specific goals.

15. Thus, although federally-funded contracts are presumptively awarded to the lowest bidder in Utah and Idaho, when a contract has a specific DBE goal, the low bidder must

meet the DBE goal, or show good faith efforts have been made to meet the goal, in order to secure the contract.

16. In practice, witness testimony established that few, if any contracts were awarded based on "good faith efforts" in either state.

17. Rather, the vast majority of successful bids met or exceeded the DBE goal.

18. With respect to both the SBA and DBE Programs, witness testimony established that the process of setting aside a contract, in the case of the SBA 8(a) Program, or setting a DBE goal on a particular contract, in the case of a state DBE Program, is affected and determined in part by the pool of certified firms.

19. `For example, because contract-specific DBE goals were meant to be achievable, the number and type of participants in a state's DBE program would affect whether and what DBE goal was set on a contract.

20. From 1997 through at least 2008, Martin conspired to, and did in fact submit, false and fraudulent tax returns and financial information to the Idaho DBE program in order to maintain MarCon's DBE certification.

21. Martin engaged in a similar scheme to fraudulently obtain and maintain MarCon's DBE certification in the state of Utah.

22. These fraudulently-obtained certifications entitled MarCon to hold itself out as a prime and/or sub-contractor whose work would count toward that state's overall DBE goal, as well as contract-specific DBE goals.

23. The evidence shows that states signed off and awarded federally-funded contracts based on MarCon's fraudulently-obtained DBE certification, which counted toward that contract's DBE goal.

24. Had the DBE Programs been aware of Martin's misrepresentations and scheme to defraud, they would not have awarded contracts in which MarCon was used to meet the goal.

25. Martin argues that she had no competitors and so the contracts would have been awarded to MarCon even without the certifications.

26. MarCon was not, particularly during the years 2000 to 2006, the only company that could have performed on contracts that are the basis for the money judgment.

27. In both a sworn deposition and in her application to the SBA, Martin acknowledged that she had competition, and was the sole bidder on Idaho Transportation Department projects only 25-30% of the time.

28. In a letter dated April 4, 2004, Martin confirmed the importance of the DBE certification to MarCon's business.

29. To the extent that MarCon enjoyed market dominance in Idaho, the very manner in which the DBE program operated meant Martin's fraudulently-obtained status buttressed that dominance, such as through the setting of goals and discouraging bidding by other non-qualified subcontractors.

30. There were 33 contracts where the DBE and SBA qualifications were crucial, and the amounts received and profits made by MarCon on these contracts are set forth accurately in Exhibit 5001.

31. On those 33 contracts, MarCon made a profit of $4,097,844.87 on gross receipts of $14,197,002.27.

32. During the period from 1999 to 2011, Martin held a varying percentage share of ownership in MarCon, but her average share was 75.26% calculated by adding up the four different percentage shares she held and dividing by four (88.4 + 78.4 + 68.4 + 65.835 ÷ 4 = 75.26).

33. Multiplying the profits made ($4,097,844.87) by Martin's average percentage ownership (75.26%) yields a figure of $3,084,038.05.

## CONCLUSIONS OF LAW

1. Martin was convicted of wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343.

2. Section 981(a)(1)(C) of Title 18 provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" the mail and wire fraud statutes "is subject to forfeiture to the United States." 18 U.S.C. § 981(a)(1)(C).

3. "The government must prove by a preponderance of the evidence (1) that the property is subject to forfeiture, and (2) the amount of any personal money judgment. *United States v. Overstreet,* 2012 WL 5969643, at *16 (D. Idaho Nov. 29, 2012); *see also, United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011).

4. As to the amount of any money judgment, the government is not limited to the amounts or victims alleged in the counts of conviction. *United States v. Pena*, 2010 WL 2054442 (9th Cir. 2010).

5. The government must "show a nexus between the crimes of conviction and the money and property it seeks to forfeit." *Overstreet, supra,* at *21.

6. The first question before this Court is "whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A).

7. The parties were unable to cite any Ninth Circuit cases setting forth a test for determining when the Government has established an appropriate causal relationship between the property to be forfeited and the statutory violation.

8. At least five other Circuits have adopted a but-for test: The Government must show that the defendant would not have obtained the property but for her illegal activity. *U.S. v. DeFries,* 129 F.3d 1293, 1333 (C.A.D.C. 1997); *U.S. v. Angiulo*, 897 F.2d 1169, 1213 (1st Cir.1990); *U.S.v. Ofchinick,* 883 F.2d 1172, 1183 (3d Cir.1989); *U.S. v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir.1989); *U.S. v. Horak*, 833 F.2d 1235, 1242-43 (7th Cir.1987).

9. The Court will apply that test in this case.

10. As discussed in the Findings of Fact above, whether the Court looks to the SBA or DBE contracts, the evidence shows that MarCon (and hence Martin) would not have been entitled to collect the contract payments that form the basis for the Government's money judgment amount, but for its fraudulently-obtained status.

11. The testimony at trial and the forfeiture hearing established that federal agencies relied upon MarCon's SBA 8(a) or DBE certification to sign off on the ultimate award of the contract.

12. Thus, but for MarCon's fraudulently-obtained status, the agencies would not have signed off on these contracts and allowed the federal money to be disbursed to MarCon.

13. For these reasons the Court finds that the Government has established the but-for causation required for forfeiture.

14. The Court turns next to the issue whether Martin is entitled to deduct direct costs from the gross receipts to arrive at a final forfeiture amount. That issue is resolved by the language of the statute.

15. Forfeiture applies to the "proceeds" traceable to a violation of certain enumerated statutes that the defendant was convicted of in this case. 18 U.S.C. § 981(a)(1)(C).

16. The statutory definition of what constitutes "proceeds" differs depending on the nature of the offense.

17. In cases involving "illegal goods," the term "proceeds" means "property of any kind obtained directly or indirectly . . . and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).

18. But the term "proceeds" is more limited if the case involves "lawful goods or lawful services that are sold or provided in an illegal manner." 18 U.S.C. § 981(a)(2)(B). In that case, "proceeds" means the money acquired "less the direct costs incurred in providing the goods or services." *Id.* The defendant must prove the direct costs, and those costs "shall not include any part of the overhead expenses . . . ." *Id.*

19. The parties cited no case law from the Ninth Circuit drawing a distinction between these two statutory provisions. But two cases from other Circuits provide persuasive if not binding insights.

20. In *U.S. v. Hasan*, 718 F.3d 338 (4th Cir. 2013), the sale of contraband cigarettes was found to be the sale of "illegal" goods as they "could never be sold lawfully" because the very act of possessing them was illegal under the law. *U.S. v. Hasan*, 718 F.3d 338 (4th Cir. 2013).

21. In *U.S. v. Nacchio,* 573 F.3d 1062, 1090 (10th Cir. 2009), the sale of Qwest stock in an insider trading case was found to be the sale of lawful goods in an unlawful manner. The Circuit held that the defendant "was not participating in an inherently unlawful activity by selling Qwest stock; trading, by itself, would not have been an unlawful activity. Rather, the illegality inhered in his selling securities ('lawful goods') in an unlawful manner, i.e., on the basis of material, nonpublic information."

22. The Court finds this case closer to *Nacchio* than *Hasan.*

23. The guardrails and barriers provided by MarCon pursuant to government contracts were "lawful goods or lawful services" within the meaning of § 981(a)(2)(B). Selling those goods and services was not inherently illegal. They were lawful goods sold under a false designation.

24. Accordingly, the Court will apply § 981(a)(2)(B), and deduct the direct costs in computing the "proceeds" subject to forfeiture.

25. That calculation is provided in the second page of Exhibit 5001. When the direct costs are deducted, the resulting forfeiture amount is $4,097,844.87.

26. Because Martin shared ownership of MarCon, she did not receive all the profits but only a percentage based on her ownership shares.

27. She is only required to forfeit "the amount of money acquired through the illegal transactions," 18 U.S.C. § 981(a)(2)(B), and hence is only liable for a percentage of the $4,097,844.87 sum corresponding to her ownership interest.

28. That sum, as calculated in the Findings of Fact above, is $3,084,038.05.

29. Forfeiture is excessive under the Eighth Amendment if it is "grossly disproportional to the gravity of the offense." *United States v. Bajakajian,* 524 U.S. 321, 334 (1998).

30. In determining the amount of the money judgment, the Court has taken into account the factors set out in *Solem v. Helm*, 463 U.S. 277, 290 (1983), and adopted by the Ninth Circuit in *United States v. Busher*, 817 F.2d 1409, 1415 (9th Cir. 1987).

31. Here, the money judgment is not "grossly" disproportionate to the offenses of conviction, given the nature and extent of the crimes; the fact MarCon owed its market dominance, at least in part, to the fraudulently-obtained statuses; the Court's statutory authority to impose substantial fines for these offenses; and the inability to truly calculate the harm caused by Martin's fraud, which affected not only the entire goal-setting process by the Idaho DBE Program, but actual and would-be competitors.

32. The evidence shows that Martin was the leader and organizer of two extensive, longstanding conspiracies conducted for the sole purpose of obtaining the contracts that form the basis for the money judgment.

33. Given Martin's own admitted dependence on the programs she defrauded, particularly the Idaho DBE Program, Martin is not like the defendant in *Busher*, where the value of the property to be forfeited greatly exceeded the total dollar amount of the fraudulent conduct. *Busher,* 817 F.2d at 1414.

34. Here, the money judgment is directly proportional to the illegal conduct: it represents the proceeds that Martin would not have obtained but for her fraud.

35. Nor was Martin a minor player; to the contrary, she was the undisputed leader and organizer of her business enterprise for over a decade.

36. Forfeiture of substitute assets is appropriate here, where the ability to trace and locate the proceeds of Martin's fraud has been substantially, if not entirely, impaired by the very manner in which Martin and her coconspirators committed the crimes that form the basis for forfeiture. *See* 18 U.S.C. § 853(p).

37. Inherent in the scheme to defraud the SBA and DBE Programs was the systematic and prolonged concealment of Martin's assets, which she accomplished in part by falsifying public and corporate records that might assist in tracing, holding property in the names of others, and transferring property into the names of nominees.

38. The Court credits the testimony of Agent Culbertson, who testified that he was unable to locate and/or trace the original fraud proceeds, due to the lack of reliable records, intervening transfers or sales, and the commingling of fraud proceeds in the MarCon operating account.

39. The Court will therefore order the forfeiture of substitute assets.

40. The substitute assets in this case consist of eight parcels of real property.

41. The Court will enter a separate Preliminary Order of Forfeiture setting out the money judgment and describing in detail the substitute assets subject to forfeiture.

DATED: January 21, 2014

B. Lynn Winmill
Chief Judge
United States District Court